# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

————————

m 98-60213

————————


ALENCO COMMUNICATIONS, INC.;
AMANA SOCIETY SERVICE COMPANY;
ARROWHEAD COMMUNICATIONS CORPORATION;
AYERSVILLE TELEPHONE COMPANY;
BARAGA TELEPHONE COMPANY;
BARRY COUNTY TELEPHONE COMPANY;
BAY SPRINGS TELEPHONE COMPANY, INC.;
BENTLEYVILLE TELEPHONE COMPANY;
BENTON RIDGE TELEPHONE COMPANY;
BLOOMINGDALE HOME TELEPHONE COMPANY;
BLUE EARTH VALLEY TELEPHONE COMPANY;
BRUCE TELEPHONE COMPANY;
CASEY MUTUAL TELEPHONE COMPANY; CFW COMMUNICATIONS
COMPANY; CITIZENS TELEPHONE COMPANY OF KECKSBURG;
CITIZENS TELEPHONE COMPANY OF HAMMOND;
CITIZENS TELEPHONE CORPORATION;
CLEMENTS TELEPHONE COMPANY; CLIMAX TELEPHONE COMPANY;
COMMUNITY SERVICE TELEPHONE COMPANY;
CRAIGVILLE TELEPHONE COMPANY, INC.;
CROCKETT TELEPHONE COMPANY; DIXVILLE TELEPHONE COMPANY;
DOYLESTOWN TELEPHONE COMPANY;
DUNBARTON TELEPHONE COMPANY, INC.;
DUNKERTON TELEPHONE COOPERATIVE;
EAGLE VALLEY TELEPHONE COMPANY;
EASTON TELEPHONE COMPANY; ECKLES TELEPHONE COMPANY;
ELKHART TELEPHONE COMPANY;
EUSTIS TELEPHONE EXCHANGE;
FARMERS COOP TELEPHONE COMPANY;
FARMERS MUTUAL TELEPHONE COMPANY-OHIO;

FARMERS MUTUAL TELEPHONE COMPANY-MINNESOTA;
FLAT ROCK MUTUAL TELEPHONE COMPANY;
FORT JENNINGS TELEPHONE COMPANY;
FRONTIER COMMUNICATIONS OF DEPUE;
GEETINGSVILLE TELEPHONE COMPANY, INC.;
GERVAIS TELEPHONE COMPANY;
GRACEBA TOTAL COMMUNICATIONS, INC.;
GRANADA TELEPHONE COMPANY;
GRANBY TELEPHONE & TELEGRAPH COMPANY-MASSACHUSETTS;
GULF TELEPHONE COMPANY; HARTINGTON TELEPHONE COMPANY;
HICKORY TELEPHONE COMPANY;
HINTON TELEPHONE COMPANY OF HINTON, OKLAHOMA, INC.; HOLLIS
TELEPHONE COMPANY;
HOME TELEPHONE COMPANY-NEBRASKA;
HOME TELEPHONE COMPANY-MINNESOTA;
HOT SPRINGS TELEPHONE COMPANY;
HUXLEY COOPERATIVE TELEPHONE COMPANY;
INDIANHEAD TELEPHONE COMPANY;
IRONTON TELEPHONE COMPANY;
JEFFERSON TELEPHONE COMPANY, INC.;
KADOKA TELEPHONE COMPANY; KALEVA TELEPHONE COMPANY;
KALIDA TELEPHONE COMPANY, INC.;
LAUREL HIGHLAND TELEPHONE COMPANY;
LIGONIER TELEPHONE COMPANY;
MANKATO CITIZENS TELEPHONE COMPANY;
MANTI TELEPHONE COMPANY;
MARIANNA & SCENERY HILL TELEPHONE COMPANY;
MARSEILLES TELEPHONE COMPANY;
MCCLURE TELEPHONE COMPANY;
MCDONOUGH TELEPHONE COOP, INC.; MEBTEL COMMUNICATIONS;
MERCHANTS & FARMERS TELEPHONE COMPANY;
METAMORA TELEPHONE COMPANY;
MID CENTURY TELEPHONE COOP, INC.;
MID COMMUNICATIONS TELEPHONE COMPANY;
MID-IOWA TELEPHONE COOP ASSOCIATION;
MIDDLE POINT HOME TELEPHONE COMPANY;
MIDSTATE TELEPHONE COMPANY-NORTH DAKOTA;

MIDWEST TELEPHONE COMPANY;
MILES COOPERATIVE TELEPHONE ASSOCIATION;
MILLRY TELEPHONE COMPANY, INC.;
MINFORD TELEPHONE COMPANY, INC.;
MINNESOTA LAKE TELEPHONE COMPANY;
MT. ANGEL TELEPHONE COMPANY;
NATIONAL TELEPHONE OF ALABAMA, INC.;
NEW LISBON TELEPHONE COMPANY;
NORTH-EASTERN PENNSYLVANIA TELEPHONE COMPANY;
NORTH ENGLISH COOP TELEPHONE COMPANY;
NORTHWESTERN INDIANA TELEPHONE COMPANY, INC.;
NOVA TELEPHONE COMPANY; ODIN TELEPHONE EXCHANGE, INC.;
ORWELL TELEPHONE COMPANY; OSAKIS TELEPHONE COMPANY;
PALMERTON TELEPHONE COMPANY;
PANHANDLE TELEPHONE COOP, INC.;
PANORA COOPERATIVE TELEPHONE ASSOCIATION;
PATTERSONVILLE TELEPHONE COMPANY;
PENNSYLVANIA TELEPHONE COMPANY;
PEOPLES MUTUAL TELEPHONE COMPANY;
PEOPLES TELEPHONE COMPANY, INC.;
PIERCE TELEPHONE COMPANY, INC.;
PINE ISLAND TELEPHONE COMPANY; PINNACLE COMMUNICATIONS;
PRAIRIE GROVE TELEPHONE COMPANY;
PYMATUNING INDEPENDENT TELEPHONE COMPANY;
REDWOOD COUNTY TELEPHONE COMPANY;
ROANOKE TELEPHONE COMPANY, INC.;
ROBERTS COUNTY TELEPHONE COOP ASSOCIATION;
RONAN TELEPHONE COMPANY; SCHALLER TELEPHONE COMPANY;
SEARSBORO TELEPHONE COMPANY;
SHELL ROCK TELEPHONE COMPANY;
SOUTH CANAAN TELEPHONE COMPANY;
SOUTHERN MONTANA TELEPHONE COMPANY;
STATE LONG DISTANCE TELEPHONE COMPANY;
STATE TELEPHONE COMPANY;
STAYTON COOPERATIVE TELEPHONE COMPANY;
STOCKHOLM-STRANDBURG TELEPHONE COMPANY;
SUMMIT TELEPHONE COMPANY; SWAYZEE TELEPHONE COMPANY;

SYCAMORE TELEPHONE COMPANY;
TRI COUNTY TELEPHONE COMPANY, INDIANA;
TRI-COUNTY TELEPHONE MEMBERSHIP CORPORATION;
VALLEY TELEPHONE COOPERATIVE, INC.;
VAN HORNE COOPERATIVE TELEPHONE COMPANY;
VENUS TELEPHONE CORPORATION;
VOLCANO TELEPHONE COMPANY;
WEST IOWA TELEPHONE COMPANY;
WEST LIBERTY TELEPHONE COMPANY;
WEST SIDE TELEPHONE COMPANY;
WEST SIDE TELEPHONE COMPANY-PENNSYLVANIA;
WEST TENNESSEE TELEPHONE COMPANY, INC.;
WESTERN TELEPHONE COMPANY-SOUTH DAKOTA;
WIKSTROM TELEPHONE COMPANY, INC.;
WILTON TELEPHONE COMPANY-NEW HAMPSHIRE;
YADKIN VALLEY TELEPHONE MEMBERSHIP CORPORATION;
YUKON-WALTZ TELEPHONE COMPANY;
and
UNITED STATES TELEPHONE ASSOCIATION,

Petitioners,

VERSUS

FEDERAL COMMUNICATIONS COMMISSION
and
UNITED STATES OF AMERICA,

Respondents.

_____

Petitions for Review of Orders
of the Federal Communications Commission
_____
January 25, 2000

4

Before SMITH, WIENER, and
EMILIO M. GARZA, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

This is a consolidated challenge to two orders of the Federal Communications Commission (the "FCC," the "Commission," or the "agency")[1] promulgated to satisfy the twin Congressional mandates articulated in the Telecommunications Act of 1996 (the "Act")[2] of providing universal telecommunications service in the United States and injecting competition into the market for local telephone service. PetitionersSSlocal telephone service providers who serve predominantly small towns and rural areasSSchallenge the orders as inconsistent with the statutory requirements of the Act; arbitrary and capricious in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A); violative of the Takings Clause, U.S. CONST. amend. V; and in noncompliance with the Regulatory Flexibility Act, 5 U.S.C. § 604. Having jurisdiction to review the orders pursuant to 28 U.S.C. § 2342(1) and 47 U.S.C. § 402(a), we deny the petitions for review.

I. THE STATUTORY MANDATES.

Universal service has been a fundamental goal of federal telecommunications regulation since the passage of the Communications Act of 1934. Indeed, the FCC's very purpose is "to make available, so far as possible, to all the people of the United States . . . a rapid, efficient, Nation-wide, and world-wide wire and communication service with adequate facilities at reasonable charges." 47 U.S.C. § 151 (as amended). *See also Texas Office of Pub. Util. Counsel v. FCC*, 183 F.3d 393, 405-06 & n.2 (5th Cir. 1999) ("*TOPUC*"), *petition for cert. filed* (Dec. 23, 1999) (No. 99-1072).

Specifically, the Act requires that universal service support be "explicit and sufficient," 47 U.S.C. § 254(e), and it articulates several guiding principles to govern universal serviceSSincluding, for example, that "access . . . be provided in all regions of the Nation . . . including low-income consumers and those in rural, insular, and high cost areas," that services and rates be "reasonably comparable" to those offered "in urban areas," that "[a]ll providers of telecommunications services . . . make an equitable and nondiscriminatory contribution to the preservation and advancement of universal service," and that universal service support be "specific" and "predictable," *id.* § 254(b)(2)-(5); Order ¶ 21. While the FCC is required to obey statutory commands, the guiding principles reflect congressional intent to delegate difficult policy choices to the Commission's discretion. *See TOPUC*, 183 F.3d at 411-12.[3]

---

[1] *In re: Federal-State Joint Board on Universal Serv.; Report and Order in CC Docket No. 96-45*, 12 FCC Rcd. 8776 (1997) ("Order"); *Fourth Order on Reconsideration in CC Docket No. 96-45; Report and Order in CC Docket Nos. 96-45, 96-262, 94-1, 91-213, 95-72*, 13 FCC Rcd. 5318 (1997); *Errata*, 13 FCC Rcd. 2372 (1998) ("Fourth Reconsideration Order").

[2] Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (to be codified as amended in scattered sections of title 47, United States Code).

[3] The Act additionally states that "[i]t shall be the policy of the United States to encourage the provision of new technologies and services to the public." 47 U.S.C. § 157(a). *Cf.* 47 U.S.C. § 254(b)(2) (providing that universal service programs be guided by principle of providing access to
(continued...)

advanced telecommunications and information services in all regions). Petitioners argue that the orders violate § 157(a).

Unlike the express statutory requirement of sufficient support of universal service support imposed by 47 U.S.C. § 254(e), § 157(a) is merely a broad statement of policy conferring substantial discretion on the Commission to determine how best to provide for new technologies and services. To our knowledge, § 157(a) has never been used to invalidate an FCC action. We conclude, therefore, that a universal service program that satisfies the specific statutory requirements of § 254(e) necessarily satisfies the broad policy statement of § 157(a).

Alongside the universal service mandate is the directive that local telephone markets be opened to competition. *See* 47 U.S.C. §§ 251-253; *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 371; *TOPUC*, 183 F.3d at 406, 412. The FCC must see to it that *both* universal service and local competition are realized; one cannot be sacrificed in favor of the other. The Commission therefore is responsible for making the changes necessary to its universal service program to ensure that it survives in the new world of competition.[4] Because Congress has conferred broad discretion on the agency to negotiate these dual mandates, courts ought not lightly interfere with its reasoned attempt to achieve both objectives. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842-44 (1984); 5 U.S.C. § 706(2)(A).

## II. THE UNIVERSAL SERVICE ORDERS.

The orders under review make various changes to universal service deemed necessary achieve universal service within a competitive environment. We describe the general principles guiding the Commission's judgment, then detail the provisions specifically at issue in petitioners' various challenges.

### A. COMMISSION PRINCIPLES.

To analyze the purpose and effect of the FCC's numerous regulatory changes to its universal service program, we find it useful first to articulate three principles the Commission has followed in making the transition from monopolistic to competitive universal service. *First*, rates must be based not on *historical, booked costs*, but rather on *forward-looking costs*. After all, market prices respond to current costs; historical investments, by contrast, are sunk costs and thus ignored.

> [I]t is current and anticipated cost, rather than historical cost[,] that is relevant to business decisions to enter markets and price products. The business manager makes a decision to enter a new market by comparing anticipated additional revenues (at a particular price) with anticipated additional costs. If the expected revenues cover all the costs caused by the new product, then a rational business manager has sound business reasons to enter the new market. The historical costs associated with the plant already in place are essentially irrelevant to this decision since those costs are 'sunk' and unavoidable and are unaffected by the new production decision. This factor may be particularly significant in industries such as telecommunications which depend heavily on technological innovation, and in which a firm's accounting, or sunk, costs may have little relation to current pricing decisions.

*MCI Communications Corp. v. American Tel. & Tel. Corp.*, 708 F.2d 1081, 1116-17 (7th Cir. 1983).[5]

---

[4] *See* Order ¶¶ 1-4, 20 (stating that it "ensure[s] that this system is sustainable in a competitive marketplace, thus ensuring that universal service is available at rates that are 'just, unreasonable, and affordable' for all Americans").

---

[5] *See also TOPUC*, 183 F.3d at 407 (stating that "the FCC decided to use the 'forward-looking' costs to calculate the relevant costs of a carrier (continued...)

(...continued)
.... To encourage carriers to act efficiently, the agency would base its calculation on the costs an efficient carrier would incur (rather than the costs the incumbent carriers historically have incurred)").

*Second*, the old regime of *implicit* subsidiesSSthat is, "the manipulation of rates for some customers to subsidize more affordable rates for others"SSmust be phased out and replaced with *explicit* universal service subsidiesSSgovernment grants that cause no distortion to market pricesSSbecause a competitive market can bear only the latter.

*TOPUC*, 183 F.3d at 406.

> For obvious reasons, this system of implicit subsidies can work well only under regulated conditions. In a competitive environment, a carrier that tries to subsidize below-cost rates to rural customers with above-cost rates to urban customers is vulnerable to a competitor that offers at-cost rates to urban customers. Because opening local telephone markets to competition is a principal objective of the Act, Congress recognized that the universal service system of implicit subsidies would have to be re-examined.

*Id.* Indeed, the Act requires that all universal service support be explicit. *See* 47 U.S.C. § 254(e).

*Finally*, the program must treat all market participants equallySSfor example, subsidies must be portableSSso that the market, and not local or federal government regulators, determines who shall compete for and deliver services to customers. Again, this principle is made necessary not only by the economic realities of competitive markets but also by statute. *See* 47 U.S.C. § 214(e)(1) (requiring that all "eligible telecommunications carrier[s] . . . shall be eligible to receive universal service support").

The FCC additionally defends the orders as reasonable *interim* regulations. The shift from monopoly to competition is indeed dramatic. Congress thus expressly contemplated that the Commission would adopt an incremental approach to retooling universal service for a world of competition.[6] Because the provisions under review are merely transitional, our review is especially deferential.[7]

---

[6] It requires the Commission to adopt rules opening the local services market to competition "within 6 months." 47 U.S.C. § 251(d)(1). By contrast, the Commission need only adopt rules establishing a "specific timetable for implementation" of universal service, and even then, it has "15 months" to do so. 47 U.S.C. § 254(a)(2). *See also TOPUC*, 183 F.3d at 436 ("By instructing the FCC to establish a 'timetable for implementation' by the statutory deadline, Congress assumed the implementation process would occur over a transition period after the fifteen-month deadline.").

[7] *See TOPUC*, 183 F.3d at 437 ("Where the statutory language does not explicitly command otherwise, we defer to the agency's reasonable judgment about what will constitute 'sufficient' support during the transition period from one universal service system to another."); *id.* at 440 n.85 (acknowledging that "we extend the FCC greater discretion in deciding what will be 'sufficient' during the transition period"); *MCI Telecomm. Corp. v. FCC*, 750 F.2d 135, 140 (D.C. Cir. 1984) (noting that "substantial deference by courts is accorded to an agency when the issue concerns interim relief").

B.  PROVISIONS.

Telephone service is jointly provided by two sets of carriers.  Local exchange carriers ("LEC's") provide local telephone service in a given geographical calling area through monopoly networks, or "exchanges," each comprising a series of "local loops" allowing for interconnection within the exchange.[8]  Inter-exchange carriers ("IXC's") provide long distance service by connecting callers served by different LEC's; such service is called "exchange access."[9]

Petitioners are LEC's serving predominantly small towns and rural areas.[10]  Intervenor Bell Atlantic, supporting the FCC and opposing petitioners, is also an LEC.  Intervenor MCI is an IXC and also supports the FCC.

The FCC has established a number of universal service programs involving LEC's and IXC's.  The Order implements a myriad of amendments to bring those programs into compliance with competition in the LEC market, but petitioners object to amendments to two of them.

*First*, they oppose various changes to the universal service support fund for high cost loops.  *Second*, before issuing the Order, the FCC allowed certain small, generally rural LEC's to weight specially the amount of time spent by their telephone switching equipment on switching long distance calls, for purposes of calculating the access charges those LEC's may collect from IXC's.  The Order would eliminate this effective subsidy and replace it with a new, explicit support fund.

1.  HIGH-COST LOOPS.

Rural LEC's face special obstacles.  The cost of providing telephone service varies with population density, because dispersed populations require longer wires and permit lesser economies in installation, service, and maintenance. Also relevant are geographic characteristics, for climate and certain types of terrain make service calls and repairs more costly.  Rural areas where telephone customers are dispersed and terrain is unaccommodating are therefore the most expensive to serve.

To meet its historic mandate of universal service, the FCC has established a universal service fund to subsidize high-cost rural LEC's to reduce the rates they must charge their customers.  An LEC is eligible for a subsidy if its operating expensesSSits "loop costs"SSare fifteen percent or more above the national average.  Loop

---

[8] *See* 47 U.S.C. § 153(26) (defining "local exchange carrier"); 47 U.S.C. § 153(47) (defining "telephone exchange service").

[9] *See* 47 U.S.C. § 153(16) (defining "exchange access"); 47 U.S.C. § 153(48) (defining "telephone toll service").

[10] *See* 47 U.S.C. § 153(37) (defining "rural telephone company").

costs include the costs of the depreciated cable, wire, and circuit equipment used to provide local service, the depreciation and maintenance expenses associated with that local plant, and the corporate operations expenses related to the provision of local service.

"Corporate operations expenses" include the costs incurred in formulating corporate policy, providing overall administration and management, and hiring accountants, consultants, and lawyers to understand and comply with FCC, state, and local regulations. To determine the amount of corporate operations expense that is properly chargeable to the provision of local service (and therefore included in total loop costs for purposes of determining eligibility for a subsidy), an LEC must reduce its total corporate operations expenses to correspond to the proportion of its entire plant that is local exchange plant.

Petitioners object to a variety of changes the Order effects to the administration of the fund. *First*, they oppose the continued imposition of a cap on growth in fund expenditures, which cap limits total available support to the previous year's level, adjusted for growth in the number of working loops. *See* Order ¶ 302. *Second*, they object to a new cap on the amount of corporate operations expenses that can be included in the loop cost calculation. The Order allows LEC's to report corporate operations expenses only up to 115% of the industry average for LEC's of like size. *See* Order ¶¶ 283-285, 307.

*Third*, the Order makes the subsidy portable, following the customer who switches service from one LEC to another. Petitioners claim that portability violates the principle of predictable funding. *See* Order ¶ 311. *Fourth*, beginning January 1, 2000, the Order imposes an annual inflation index on the loop cost eligibility benchmarkSSthe minimum amount a loop must cost to be awarded a subsidySSreplacing the former approach of recalculating a fresh benchmark periodically, based on updated estimates of industry averages. *See* Order ¶¶ 300-301; 47 C.F.R. § 36.622(d) (1997). *Finally*, the Order disallows additional universal service support when a rural LEC acquires and upgrades another exchange, *see* Order ¶ 308, despite petitioners' claim that such mergers are efficient and should be encouraged.

11

The cumulative result of all these changes, petitioners say, is that the Commission has rendered LEC's unable to earn a fair return and has discouraged future investment in telecommunications, and thereby has acted arbitrarily and capriciously and has violated the Act's sufficient funding requirement and the Takings Clause.

### 2. SWITCHING COSTS.

IXC's pay "access charges" to LEC's for the right to have access to an LEC's local exchange to connect long-distance calls to and from that exchange. Jurisdiction to regulate access charges is shared between federal and state governments. To implement rate-of-return regulation, state and federal regulators must allocate the costs of operating an LEC between the delivery of intrastate, interexchange telephone service (which is regulated by state entities) and the provision of interstate service (which is subject to the FCC's jurisdiction). To determine how the allocations are to be made, the agency has promulgated a number of cost separation rules.

The separation rules for costs associated with connecting callsSSa process known as "switching"SSare based on "dial equipment minutes of use" ("DEM's"). Under the rules, an LEC divides its total DEM's between those used to switch interstate calls and those used to switch intrastate calls.

Before the orders under review, the FCC allowed certain small, generally rural LEC's to weight their DEM totals with a "toll weighting factor," thereby providing LEC's with a higher cost basis on which their federal access charge would be based. Petitioners maintain that the practice of DEM weighting reflects the higher cost of switching a long distance or "toll" call than that of switching a local call, because certain network functions required by inter-exchange carriersSSsuch as equal access, intra-LATA toll dialing parity, toll screening, toll blocking, Signaling System 7 (SS7), expanded carrier identification codes, and 800 number portabilitySSrequire additional central processing hardware and software.

The FCC has long held, however, that the disparity between intrastate and interstate call switching is a relic of old, electromechanical technology and that modern digital switching equipment largely eliminates the cost differential.[11] Toll-weighting

---

[11] As the Commission stated in 1987,

The Mountain States Telephone and Telegraph Company, Northwestern Bell Telephone Company, Pacific Northwest Bell Telephone Company (US West), which originally supported the use of weighted
(continued...)

continues today, not out of adherence to principles of cost causationSSwhich provide that costs be charged to the source of the costSSbut rather to provide an implicit subsidy for rural LEC's.[12]

The Order replaces toll-weighting with a new universal service fund (separate from the fund for high-cost loops). *See* Order ¶¶ 303-304. Petitioners object for three reasons.

_____

(...continued)

DEM in its comments, changed its position to support measured DEM in reply comments because it believes the ongoing process of replacing older technology with digital switches will eliminate the need for any toll weighting. We believe that modern digital switching equipment has greatly reduced, if not eliminated, the additional cost of toll switching. ... [W]e believe that the need for toll weighting will continue to diminish and will eventually be eliminated as the exchange carriers continue to replace older technology equipment with digital switches.

*In the Matter of Amendment of Part 67 of the Commission's Rules and Establishment of a Joint Board, Recommended Decision and Order in CC Docket No. 80-286,* 2 FCC Rcd. 2551, ¶ 49 (1987). *See also In the Matter of MTS and WATS Market Structure, Amendments of Part 67 (New Part 36) of the Commission's Rules and Establishment of a Federal-State Joint Board, Report and Order in CC Docket Nos. 78-72, 80-286, 86-297,* 2 FCC Rcd. 2639, ¶ 5 (1987).

[12] *See TOPUC*, 183 F.3d at 425 (noting "the sorts of implicit subsidies currently used by the FCC in its [DEM] weighting program").

*First*, they claim the Order arbitrarily and capriciously abandons cost-causation principles. *Second,* because it would be financed by all telecommunications carriers, including small LEC's such as petitioners, the new fund constitutes an unlawful subsidy by small LEC's in favor of IXC's because it effectively saves IXC's from having to pay for the more expensive cost of switching their long-distance calls. *Finally*, just as they do with respect to the high-cost loop fund, petitioners object on the ground that portability violates the principle of predictability and the statutory command of sufficient funding. Specifically, they claim that if just 25% of the revenue that the FCC has made portable is lost by a typical small LEC, the annual rate of return for interstate access service will, in many cases, fall to minus 10.53%.

III.  COMMUNICATIONS ACT AND ADMINISTRATIVE PROCEDURE ACT CHALLENGES.

Petitioners' main challenge is that the orders are inconsistent with the statutory mandates of the Act. Therefore, they claim, the orders constitute arbitrary and capricious regulation.

A.  STANDARD OF REVIEW.

Courts review agency conduct in two ways. First, we review agency interpretation of their statutory authority under the familiar *Chevron* two-step

inquiry. *See Chevron*, 467 U.S. at 842-44.

Under step one, where "Congress has directly spoken to the precise question at issue," we must "give effect to the unambiguously expressed intent of Congress," reversing an agency's interpretation that does not conform to the statute's plain meaning. *Id.* at 842-43. Under step two, which addresses situations in which the statute is either silent or ambiguous, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. We reverse only if the agency's construction is "arbitrary, capricious or manifestly contrary to the statute." *Id.* at 844. If, on the other hand, the interpretation "is based on a permissible construction of the statute," we defer to the agency's construction.

In addition, the Administrative Procedure Act ("APA") empowers courts to reverse agency action that is arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A); *Harris v. United States*, 19 F.3d 1090 (5th Cir. 1994). *Chevron* step-two focuses on the agency's interpretation of its statutory power, while APA arbitrary-and-capricious review focuses on the reasonableness of the agency's decision-making process pursuant to that interpretation. *See TOPUC*, 183 F.3d at 410. Like *Chevron*

step-two, APA arbitrary and capricious review is narrow and deferential, requiring only that the agency "articulate[] a rational relationship between the facts found and the choice made." *Harris*, 19 F.3d at 1096 (quoting *Motor Vehicles Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "[T]he agency's decision need not be ideal." *Id.* Moreover, our review here is especially deferential, because the provisions under review are merely transitional, as expressly contemplated by the Act.[13]

B. ANALYSIS.

Petitioners assert two general themes. *First*, the challenges go directly to the heart of FCC expertiseSSwhether the Commission has sufficiently and explicitly supported universal service in an open, competitive marketSSand thus must overcome substantial judicial deference. Examining the Act through the lens of *Chevron,* we note that Congress obviously intended to rely primarily on FCC discretion, and not vigorous judicial review, to ensure satisfaction of the Act's dual mandates. As we noted in a prior challenge to an FCC universal service regulation,

[t]o be sure, the FCC's reason for adopting this methodology is not just to

---

[13] *See* note 7, *supra.*

preserve universal service. Rather, it is also trying to encourage local competition . . . . As long as it can reasonably argue that the methodology will provide sufficient support for universal service, however, it is free, under the deference we afford it under *Chevron* step-two, to adopt a methodology that serves its other goal of encouraging local competition.

*TOPUC*, 183 F.3d at 412. Petitioners do not satisfy the high evidentiary standard necessary to establish that the Commission acted arbitrarily and capriciously when it produced its interim rules.

*Second*, petitioners' sufficiency challenge fundamentally misses the goal of the Act. The Act does *not* guarantee all local telephone service providers a sufficient return on investment; quite to the contrary, it is intended to introduce competition into the market. Competition necessarily brings the risk that some telephone service providers will be unable to compete. The Act only promises universal service, and that is a goal that requires sufficient funding of *customers*, not *providers*. So long as there is sufficient and competitively-neutral funding to enable all customers to receive basic telecommunications services, the FCC has satisfied the Act and is not further required to

ensure sufficient funding of every local telephone provider as well.

Moreover, excessive funding may itself violate the sufficiency requirements of the Act. Because universal service is funded by a general pool subsidized by all telecommunications providersSSand thus indirectly by the customersSSexcess subsidization in some cases may detract from universal service by causing rates unnecessarily to rise, thereby pricing some consumers out of the market.

1. HIGH-COST LOOPS.

Petitioners fail to show that the FCC's various changes to the universal service support fund for high-cost loops unreasonably fails to provide sufficient funding for universal service or otherwise constitutes an arbitrary and capricious regulation under the Act. *First,* they object to the agency's continuation of a cap on growth in the fund, adjusted only for changes in the total number of working loops. The cap's track record, however, reflects a reasonable balance between the Commission's mandate to ensure sufficient support for universal service and the need to combat wasteful spending. The agency's broad discretion to provide sufficient universal service funding includes the decision to impose cost controls to avoid excessive expenditures that will detract from universal service.

Petitioners do not show how the FCC has abused that discretion.

*Second,* petitioners object to the introduction of a cap on the amount of corporate operations expenses that may be reported to determine eligibility for high-cost loop support. The Order limits LEC's to 115% of the industry average for corporate operations expenses accrued by carriers of like size. *See* Order ¶¶ 283-285, 307.

Petitioners claim that corporate operations expenses are already capped and that there is no need for a second cap.[14] It is true that, even before the Order, the amount of reportable corporate operations expenses was determined by multiplying an LEC's total corporate operations expenses by the percentage of its total plant that is local exchange plant. This is no cap, however, but rather a reasonable method of allocating costs. The proposed 115% rule is thus a wholly reasonable exercise of the Commission's legitimate power to combat abusive spending; absent the proposed rule, the regulations provide no incentive to keep costs down. Moreover, given its legitimate cost concerns, the agency was well within its

discretion to impose a cap rather than to undertake the more costly alternative of intensive auditing.

Petitioners additionally claim that the cap on review is excessively burdensome, driving interstate rates of return to 2.81% for rural LEC's. Even assuming that this statistic proves that *customers* have failed to receive sufficient universe service support, this statistic is based on the experience of only a single providerSSthe Bay Springs Telephone CompanySSand not a statistically valid sample. Petitioners' evidence therefore does not establish that the cap unreasonably fails to provide sufficient service; at most it presents an anomaly that can be addressed by a request for a waiver.[15]

Moreover, the statistic ignores the Fourth Reconsideration Order, in which the FCC responded to petitioners' concerns by, *inter alia,* establishing a minimum cap of $300,000. *See* Fourth Reconsideration Order ¶¶ 85-109. Petitioners present no evidence disputing the sufficiency of the currently operative cap.

*Third*, the order provides that the universal service subsidy be portable so that it moves with the customer,

---

[14] *See Alltel Corp. v. FCC*, 838 F.2d 551, 561 (D.C. Cir. 1988) ("A regulation perfectly reasonable and appropriate in the face of a given problem may be highly capricious if that problem does not exist.").

[15] *See* 47 C.F.R. § 1.3; Fourth Reconsideration Order ¶¶ 93, 102, 108.

rather than stay with the incumbent LEC, whenever a customer makes the decision to switch local service providers. Petitioners claim that portability violates the statutory principle of predictability, *see* 47 U.S.C. § 254(b)(5), and the statutory command of sufficient funding.

We reiterate that predictability is only a principle, not a statutory command. To satisfy a countervailing statutory principle, therefore, the FCC may exercise reasoned discretion to ignore predictability. *See TOPUC*, 183 F.3d at 411-12.

Moreover, petitioners cannot even show that portability violates sufficiency or predictability. The purpose of universal service is to benefit the customer, not the carrier.[16] "Sufficient" funding of the customer's right to adequate telephone service can be achieved regardless of which carrier ultimately receives the subsidy.[17]

The methodology governing subsidy disbursements is plainly stated and made available to LEC's. What petitioners seek is not merely predictable funding mechanisms, but predictable market outcomes. Indeed, what they wish is protection from competition, the very antithesis of the Act.

To the extent petitioners argue that Congress recognized the precarious competitive positions of rural LEC's, their concerns are addressed by 47 U.S.C. § 214(e), which empowers state commissions to regulate entry into rural markets.[18] Furthermore, portability is not only consistent with predictability, but also is dictated by principles of competitive neutrality and the statutory command that universal service support be spent "only for the provision, maintenance, and upgrading of facilities and services for which the [universal service] support is intended." 47 U.S.C. § 254(e).

*Fourth,* rather than continue to determine the eligibility threshold for high-cost loop support by recalculating the national average loop cost, the FCC now simply will adjust the previously-calculated national average by an annual inflation index. Even assuming, as petitioners contend, that inflation adjustments to historical averages in fact would render fewer LEC's eligible for universal service subsidies than would be the case under the former approach, petitioners nevertheless fail to show how this interim approach is unreasonable. Given the eventual transition

---

[16] *See, e.g.,* 47 U.S.C. § 254(b)(3) (stating that "Consumers in all regions of the Nation" shall receive comparable telephone service).

[17] Petitioners estimate that the introduction of competition will result in a loss of approximately 25% of the customer base. The FCC counters with historical trends that would predict market share losses of only 3%. Because we conclude that the sufficiency requirement is intended to benefit the customer, not the provider, we need not resolve this particular dispute.

[18] *See* 47 U.S.C. § 254(e)(2) ("Before designating an additional eligible telecommunications carrier for an area served by a rural telephone company, the State commission shall find that the designation is in the public interest.").

from historic cost to forward-looking cost, as required by competition, the FCC reasonably concluded that the effort of collecting historic cost data no longer was justified.

*Finally*, petitioners claim that sales and transfers of exchanges by rural providers are efficient and ought to be encouraged and subsidized. The Order, by contrast, denies additional universal service support in cases in which a rural LEC purchases another exchange.

When the permanent rules for universal access within the context of local competition are in place, all exchanges will be governed by uniform rules with respect to universal service support, without regard to the rural or non-rural status of the LEC. In the interim, however, the rules continue to treat rural and other LEC's differently, in recognition of the continued greater need of rural LEC's. The opportunity thus exists for gaming the different universal service support regimes by transferring ownership to a rural LEC. The FCC acted within its discretion to combat such gaming by keying regulatory treatment to an exchange's original ownership status, without regard to any subsequent transfer in ownership.

The Commission argues that, as a last resort, the availability of waivers cures its orders of any deficiency with respect to sufficiency and predictability.[19] Even if the waiver provisions were debatable as a policy matter,

they are not an issue for judicial review. For our purposes, a waiver provision is legitimate if the underlying rule is rational, *see National Rural Telecomm. Ass'n v. FCC*, 988 F.2d 174, 181 (D.C. Cir. 1993), and cannot save a rule that on its own has no rational basis, *see Alltel Corp*, 838 F.2d at 561-62. We therefore can uphold these amendments relating to the high-cost loop fund without addressing the wisdom of allowing waivers.

## 2. SWITCHING COSTS.

Petitioners also fail to show that the FCC's various changes to the treatment of switching equipment costs unreasonably fail to provide sufficient and explicit funding for universal service or otherwise constitute an arbitrary and capricious exercise of agency powers under the Act. *First*, petitioners claim that the changes arbitrarily and capriciously abandon cost-causation principles. They insist on retaining special weighting on the assumption that it is in fact more costly to switch long-distance calls than local calls. Therefore, under cost-causative principles, IXC's should pay higher access charges, because they are responsible for a greater proportion of switching costs.

As we have said, however, the Commission has long abandoned this assumption. Instead, special weighting has been allowed to continue solely to provide an additional subsidy to rural LEC's, an interest that would be equally served by the new universal service support fund. Indeed, the Order makes plain that the new fund shall provide support "corresponding in amount to that generated formerly by DEM weighting." Order ¶ 303. Moreover, by mandating that all universal service support be "explicit," 47 U.S.C. § 254(e) requires that this special weighting be eliminated.

---

[19] *See* 47 C.F.R. § 1.3 (general waiver provision for all FCC regulations); Fourth Reconsideration Order ¶ 38 (providing for waiver of indexed cap on growth in high cost loop fund); *Id.* at ¶¶ 93, 102, 108 (providing for waiver of cap on corporate operations expenses).

Petitioners' second objection simply misconstrues the requirement of "explicit" funding. They argue that, because the new fund would be financed by all telecommunications carriers, including small LEC's such as petitioners, the new fund constitutes an unlawful subsidy in favor for IXC's.

Again, petitioners rest their argument on the same assumption deemed obsolete by the FCCSSthat long-distance switching is more costly than local switching. Even so, we made clear in *TOPUC* that the implicit/explicit distinction turns on the difference between direct subsidies from support funds and recovery through access charges and rate structures. "The statute provides little guidance on whether 'explicit' means 'explicit to the consumer' . . . or 'explicit to the carrier' . . . [but it] does state, however, that all universal service support should be 'explicit.' . . . By forcing GTE to recover its universal service contributions from its access charges, the FCC's interpretation maintains an implicit subsidy for ILEC's such as GTE." 183 F.3d at 425.

Petitioners thus misconstrue the meaning of the explicit funding requirement. The fact that the fund is subsidized by contributions from all telecommunications providers, including LEC's, does not make it an implicit subsidy under § 254(e), even if it effectively redistributes resources among telecommunications providers.

Moreover, § 254(b)(4) requires "*[a]ll* providers of telecommunications services [to] make an equitable and nondiscriminatory contribution to the preservation and advancement of universal service." 47 U.S.C. § 254(b)(4) (emphasis added); *see also* 47 U.S.C. § 254-(d). The Commission reasonably applied the principle of equitable and nondiscriminatory contribution by requiring contributions from all telecommunications providers.

*Finally*, petitioners object on the ground that portability violates the principle of predictability and the statutory command of sufficient funding. Specifically, they claim that, if just 25% of the revenue that the FCC has made portable is lost by a typical small LEC, the annual rate of return for interstate access service will, in many cases, fall to minus 10.53%.

As we have said, the Commission reasonably construed the predictability principle to require only predictable *rules* that govern distribution of the subsidies, and not to require predictable *funding amounts*. Indeed, to construe the predictability principle to require the latter would amount to protection from competition and thereby would run contrary to one of the primary purposes of the Act.

Moreover, petitioners' approach to the predictability principle would prohibit also the *current* subsidy effect of weighting switching costs. Under the current plan, LEC's receive the subsidy implicitly through access chargesSScosts that are realized only when customers make telephone calls. The old system of implicit subsidies is no less portable than is the explicit subsidies contemplated by the new fund, for an LEC cannot assess access charges against IXC's for the costs of a customer who has left that LEC for another provider. We therefore uphold the Order over petitioners' APA and *Chevron* challenges.

## IV. TAKINGS CHALLENGE.

Notwithstanding the above analysis, petitioners request us to read the Act to avoid a violation of the Takings Clause. *See Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council*, 485 U.S. 568, 575 (1988). We see no reason to invoke the canon of avoidance, however, because we are simply not presented with a constitutional violation.

The Fifth Amendment protects utilities from regulations that are "so unjust as to be confiscatory." *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 307 (1989). Petitioners therefore must show that a regulation will "jeopardize the financial integrity of the companies, either by leaving them insufficient operating capital or by impeding their ability to raise future capital," or they must demonstrate that the reduced subsidies "are inadequate to compensate current equity holders for the risk associated with their investments under a modified prudent investment scheme." *Duquesne*, 488 U.S. at 312.

It is not enough that a party merely speculates that a government action will cause it harm. Rather, a taking must "'necessarily' result from the regulatory actions." *TOPUC*, 183 F.3d at 437 (*citing United States v. Riverside Bayview Homes*, 474 U.S. 121, 128 n.5 (1985)). Such a showing cannot be made here "until the administrative agency has arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular [property right] in question." *Williamson County Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 191 (1985).

At the very least, therefore, petitioners must wait to experience the actual

consequences of the Order before a court may even begin to consider whether the FCC has effected a constitutional taking. Until it is known what level of universal service funding each petitioner will receive under the Order, and under what circumstances the Commission will grant a waiver, we cannot seriously entertain a Takings Clause challenge.

Furthermore, petitioners do not present credible evidence that the Order ever will cause the drastic consequences for rural LEC's articulated in *Duquesne*. The mere fact that, "[f]or many rural carriers, universal service support provides a large share of the carriers' revenues," Order ¶ 294, is not enough to establish that the orders constitute a taking. The Fifth Amendment protects against takings; it does not confer a constitutional right to government-subsidized profits. The Takings Clause thus erects no barrier to our *Chevron* and APA analysis.

## V. REGULATORY FLEXIBILITY ACT CHALLENGE.

Under the Regulatory Flexibility Act ("RFA"), final agency rules must contain a "final regulatory flexibility analysis" ("FRFA"), 5 U.S.C. § 604(a), which must include

> a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected.

5 U.S.C. § 604(a)(5). In 1996, Congress provided for judicial review of agency compliance with the RFA. *See* 5 U.S.C. § 611(a)(1). We review only to determine whether an agency has made a "reasonable, good-faith effort" to carry out the mandate of the RFA. *Associated Fisheries, Inc. v. Daley*, 127 F.3d 104, 114 (1st Cir. 1997).

Petitioners' RFA argument amounts to little more than a redressing of its earlier *Chevron* and APA claims. The RFA is a procedural rather than substantive agency mandate, to be sure,[20] but petitioners fail to articulate specific procedural flaws in the FCC's promulgation of the orders. In fact, both orders are accompanied by substantial discussion and deliberation, including consideration and reasoned rejection of significant alternatives which, in the Commission's judgment, would not have achieved with equivalent success its twin statutory mandates of universal service and local competition. The RFA requires no more.[21]

Petitioners come closest to stating a meritorious procedural objection when they assert that the FCC failed either to undertake or to present economic analysis. Even assuming that that were so, the RFA plainly does not require economic analysis, but mandates only that the agency describe the steps it took "to

---

[20] *See Associated Fisheries*, 127 F.3d at 114 (stating that "section 604 does not command an agency to take specific substantive measures, but, rather, only to give explicit consideration to less onerous options").

[21] *See Associated Fisheries*, 127 F.3d at 115 (noting that "section 604 does not require that an FRFA address every alternative, but only that it address significant ones.").

minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes." 5 U.S.C. § 604(a)(5).

The RFA specifically requires "a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule." *Id.* Nowhere does it require, however, cost-benefit analysis or economic modeling. Indeed, the RFA expressly states that, "[i]n complying with [section 604], an agency may provide either a quantifiable or numerical description of the effects of a proposed rule or alternatives to the proposed rule, or more general descriptive statements if quantification is not practicable or reliable." 5 U.S.C. § 607.[22] We therefore conclude that the FCC reasonably complied with the requirements of the RFA.

### CONCLUSION.

Petitioners' various challenges fail because they fundamentally misunderstand a primary purpose of the Communications ActSSto herald and realize a new era of competition in the market for local telephone service while continuing to pursue the goal of universal service. They therefore confuse the requirement of sufficient support for universal service within a market in which telephone service providers compete for customers, which federal law mandates, with a guarantee of economic success for all providers, a guarantee that conflicts with competition.

The FCC interim orders are reasonably tailored to achieving universal service and competition in local markets. They do not effect a cognizable, unconstitutional taking. And they were promulgated in reasonable compliance with the requirements of the RFA. We therefore DENY the petitions for review.

Judge WIENER concurs in the judgment only.

---

[22] *See also Associated Fisheries*, 127 F.3d at 115 ("Section 604 prescribes the content of an FRFA, but it does not demand a particular mode of presentation.").